FILED

2022 Mar-31  PM 04:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

|  |  |  |
|---|---|---|
| **KRISTY HUNTER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  4:20-cv-00858-MHH** |
| | } | |
| **NANCY BERRYHILL,** | } | |
| **Acting Commissioner of the** | } | |
| **Social Security Administration,[1]** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Kristy Hunter has asked the Court to review a final adverse decision of the Commissioner of Social Security pursuant to 42 U.S.C. §§ 405(g) and 1383(c). The Commissioner denied Ms. Hunter's applications for disability insurance benefits and for supplemental security income based on an Administrative Law Judge's finding that Ms. Hunter was not disabled. Ms. Hunter argues that the Administrative Law Judge—the ALJ—erred because the ALJ did not accord proper weight to the opinion of a consulting psychologist, did not accord proper weight to an examining

_____

[1] The Court asks the Clerk to please substitute Kilolo Kijakazi for Nancy Berryhill as the defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 25(d) (When a public officer leaves office, that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

psychologist, did not properly consider Ms. Hunter's obesity, and did not pose hypotheticals to the vocational expert—the VE. For the reasons that follow, the Court finds that the Commissioner's decision is not supported by substantial evidence.

## LEGAL STANDARD FOR DISABILITY UNDER THE SSA

To succeed in her administrative proceedings, Ms. Hunter had to prove that she was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if [she] is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin*, 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[2] A claimant must prove that [she] is disabled. *Gaskin*, 533 Fed. Appx. at 930 (citing *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003)).

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or

_____

[2] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited March 15, 2022).

combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

## ADMINISTRATIVE PROCEEDINGS

Ms. Hunter applied for supplemental security income on December 31, 2011. The SSA received her application on February 3, 2012. (Doc. 11-4, p. 2; Doc. 11-6, p. 2).[3] Ms. Hunter alleged that her disability began on July 19, 2008. (Doc. 11-7, p. 2). The Commissioner initially denied Ms. Hunter's application on April 26, 2012. (Doc. 11-5, p. 3). Ms. Hunter requested a hearing before an ALJ. (Doc. 11-5, p. 10). Ms. Hunter's attorney withdrew before the hearing. Ms. Hunter appeared

_____

[3] In 2007, the Commissioner denied Ms. Hunter's application for disability insurance benefits. (Doc. 11-7, p. 2). The record does not indicate that Ms. Hunter appealed from that decision.

3

at the hearing on June 17, 2013.  (Doc. 11-3, pp. 29, 31).  So did Mr. Parsons, a vocational expert.  (Doc. 11-3, p. 32).  At the hearing, Ms. Hunter indicated that she wanted to obtain counsel; therefore, the ALJ continued the hearing for 60 days. (Doc. 11-3, p. 38).  The ALJ discussed with Ms. Hunter medical and psychiatric treatment records that he planned to seek.  (Doc. 11-3, pp. 34-38).

The ALJ rescheduled the hearing for October 3, 2013.  (Doc. 11-5, p. 43). Ms. Hunter did not appear, so the Commissioner asked Ms. Hunter in writing to explain her absence.  (Doc. 11-5, p. 63).  Ms. Hunter responded that her husband's work schedule prevented her from appearing, and her new lawyer, Mr. McAfee, was supposed to appear on her behalf.  (Doc. 11-5, p. 65).  The ALJ rescheduled Ms. Hunter's hearing again, this time for January 29, 2014, but the hearing was postponed because of inclement weather.  (Doc. 11-9, p. 12).  The hearing was rescheduled for April 21, 2014.  (Doc. 11-5, p. 67).  Ms. Hunter did not appear. (Doc. 11-5, p. 90).  Again, the Commissioner asked Ms. Hunter to explain her absence.  In her response, Ms. Hunter explained that she could not appear for the hearing because of her panic attacks.  (Doc. 11-5, pp. 90-93).  Ms. Hunter indicated that she did not wish to appear at a hearing and asked the ALJ to decide her application based on her medical records.  (Doc. 11-5, pp. 91-92; Doc. 11-7, p. 59). To assist in his evaluation of Ms. Hunter's SSI application, the ALJ obtained opinions from a VE via interrogatories.  (Doc. 11-4, p. 15).

The ALJ issued an unfavorable decision on August 8, 2014. (Doc. 11-4, pp. 3-16). Ms. Hunter filed exceptions to the ALJ's decision with the Appeals Council. (Doc. 11-3, pp. 25-26). On February 17, 2016, the Appeals Council declined Ms. Hunter's request for review, making the Commissioner's decision final. (Doc. 11-3, pp. 2-4). Ms. Hunter filed a complaint in the United States District Court for the Northern District of Alabama, requesting review of the Commissioner's decision. On January 24, 2017, the Court affirmed the ALJ's decision. (Doc. 11-10, pp. 8-22).

With the help of a new attorney, Ms. Hunter appealed the district court's decision to the United States Court of Appeals for the Eleventh Circuit. (Doc. 11-10, p. 23). On October 16, 2017, the Court of Appeals affirmed in part and remanded for the Commissioner to consider new medical evidence that Ms. Hunter provided. (Doc. 11-10, pp. 37-51). The Eleventh Circuit concluded that the new evidence, Dr. Wilson's opinions, was "new, material, and chronologically relevant." (Doc. 11-10, p. 49).

Meanwhile, with the assistance of her new attorney, Ms. Hunter filed a claim for disability insurance benefits under Title II on September 1, 2017, and she filed a new application for supplemental security income on September 6, 2017. (Doc. 11-12, pp. 2-4, 11). On November 29, 2017, the Commissioner advised Ms. Hunter's attorney that Ms. Hunter met the requirements for supplemental security income as

of August 2017 because she was found disabled on August 25, 2017.  (Doc. 11-11, pp. 9-11).[4]

Ms. Hunter appealed the ALJ's decision to the Appeals Council.  On July 17, 2018, the Appeals Council remanded Ms. Hunter's case to the ALJ for further proceedings on Ms. Hunter's 2011 application, consistent with the Eleventh Circuit's decision on appeal.  The Appeals Council directed the ALJ to "obtain medical expert evidence."  (Doc. 11-10, p. 63).  The Appeals Council also affirmed the ALJ's determination, based on Ms. Hunter's 2017 application, that Ms. Hunter was disabled as of August 25, 2017.  (Doc. 11-10, p. 64).  The Appeals Council stated:  "[T]he period prior to August 25, 2017 requires further adjudication.  If any of the evidence in the subsequent [2017] application relates to the period at issue in this case [dating to 2011], it should be added to the current record for consideration." (Doc. 11-10, p. 64).  The Appeals Council instructed the ALJ to give Ms. Hunter another opportunity for a hearing.  (Doc. 11-10, p. 64).

On May 16, 2019, Ms. Hunter attended a hearing before an ALJ.  (Doc. 11-9, p. 46).  On August 9, 2019, the ALJ issued an unfavorable decision, concluding that Ms. Hunter was not disabled for the period preceding August 25, 2017.  (Doc. 11-9, pp. 9-31).  Ms. Hunter filed exceptions to the ALJ's decision with the Appeals Council.  (Doc. 11-7, pp. 69-91).  On June 10, 2020, the Appeals Council denied

_____

[4] Ms. Hunter did not qualify for disability insurance benefits.

Ms. Hunter's request for review, (Doc. 11-9, p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. §§ 405(g) and 1383(c).

## EVIDENCE IN THE ADMINISTRATIVE RECORDS

### *Ms. Hunter's Medical Records*

To support her applications, Ms. Hunter submitted medical records that relate to diagnoses and treatment of hypertension, morbid obesity, panic disorder with agoraphobia, depression, carpal tunnel syndrome, fibromyalgia, sleep apnea, erythrodermic, psoriasis, gastroesophageal reflux disease, hypoglycemia, migraine headaches, and asthma.  The Court has considered Ms. Hunter's complete medical history with a focus on records that relate to the relevant period of December 31, 2011, to August 24, 2017.  The records that follow seem to be the most relevant to Ms. Hunter's arguments in this appeal.

### *Dr. Jack Bentley's Opinion*

On April 9, 2012, Jack Bentley Jr., Ph.D., evaluated Ms. Hunter.  (Doc. 11-8, p. 41).  Ms. Hunter was 38 years old and reported that she had multiple health problems that significantly affected her daily life, including hypertension, carpal tunnel syndrome in her right hand, fibromyalgia, and back pain.  Ms. Hunter also reported that she had a stroke in 2000.  Dr. Bentley reported that Ms. Hunter's speech was slow, and she had mild residual right-side paresis, meaning partial paralysis with

weakened or impaired muscles.   (Doc. 11-8, pp. 41, 43).   https://medical-dictionary.thefreedictionary.com/paresis (last visited March 29, 2022); https://www.healthline.com/health/paresis (last visited March 29, 2022).

Ms. Hunter reported that she started experiencing depression and anxiety after her stroke. (Doc. 11-8, p. 41). Ms. Hunter indicated that she had panic attacks, and the attacks increased in frequency and intensity following the death of her grandmother in 2011. (Doc. 11-8, p. 41). Dr. Bentley noted that Ms. Hunter visualized and talked with her grandmother at night, but Ms. Hunter acknowledged that she did not experience paranoia or hallucinations. (Doc. 11-8, p. 41).

Dr. Bentley indicated that Ms. Hunter had not received formal psychiatric treatment because she did not have health insurance. (Doc. 11-8, p. 41). Ms. Hunter had not been hospitalized for psychiatric or mental health reasons, and she had no history of homicidal or suicidal ideations. (Doc. 11-8, p. 41). Dr. Bentley wrote, "[Ms. Hunter] is severely disabled by the anxiety and panic attacks when in a group of people. There is evidence of moderate agoraphobia. She avoids leaving home unless accompanied by her son or husband." (Doc. 11-8, p. 41).

Dr. Bentley noted that Ms. Hunter was morbidly obese and that her gait was "slow and labored." (Doc. 11-8, p. 42). Ms. Hunter was five feet tall and weighed 335 pounds. (Doc. 11-8, p. 42). Dr. Bentley characterized Ms. Hunter's vocabulary as "rather impoverished" but found no impairment in her receptive or expressive

communication skills.  (Doc. 11-8, p. 42).  Dr. Bentley wrote that Ms. Hunter's "mood was moderately dysphoric," and that "[t]here was evidence of significant anxiety and mild panic" during her interview.  (Doc. 11-8, p. 42).  Dr. Bentley noted that Ms. Hunter had difficulty focusing her attention.  (Doc. 11-8, p. 42).  Ms. Hunter could not recall three objects after a five-minute delay.  (Doc. 11-8, p. 42).  Dr. Bentley reviewed results of intelligence tests administered to Ms. Hunter in 2005 that suggested that Ms. Hunter's cognitive functioning was "in the Low Average Range."  (Doc. 11-8, p. 43).

Ms. Hunter reported that she completed her activities of daily living independently.  (Doc. 11-8, p. 43).  Ms. Hunter reported that she no longer drove because of severe anxiety.  (Doc. 11-8, p. 43).  Dr. Bentley indicated that Ms. Hunter had poor sleep quality because of anxiety, chronic pain, and racing thoughts.  (Doc. 11-8, p. 43).  Ms. Hunter reported that she was last employed in 1992.  She indicated that she worked for two months each at Cooper's Hosiery and Fruit of the Loom.  (Doc. 11-8, p. 42).  Ms. Hunter paired socks.  (Doc. 11-8, p. 42).

Dr. Bentley diagnosed Ms. Hunter with depressive disorder and panic disorder with agoraphobia.  (Doc. 11-8, p. 43).  Dr. Bentley noted that Ms. Hunter's impairment level for simple tasks would appear to fall in the marked to severe range due to her obesity, multiple health problems, and panic disorder.  (Doc. 11-8, p. 44).

Dr. Bentley wrote, "[t]he likelihood of any impairment in her functioning is guarded at best." (Doc. 11-8, p. 44; *see also* Doc. 11-8, p. 43).

### *Dr. Robert Estock's Opinion*

On April 24, 2012, Dr. Estock performed a non-examining review of Ms. Hunter's medical records. Those records included Dr. Muller's 2005 diagnosis of panic attacks, a July 2011 record reflecting a single episode of major depressive disorder, an October 2011 record reflecting acute anxiety, a February 2012 record indicating intact memory and appropriate mood/affect, and Dr. Bentley's April 2012 report. (Doc. 11-8, p. 48). Dr. Estock concluded that Ms. Hunter was moderately limited in her ability to understand and remember detailed instructions, but she could understand and remember simple instructions. He found that Ms. Hunter was moderately limited in her ability to work with or in proximity to others without being distracted by them, moderately limited in her ability to respond appropriately to criticism from supervisors, moderately limited in her ability to interact appropriately with the general public, and moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms. (Doc. 11-8, pp. 51-52). Dr. Estock stated that Ms. Hunter "may benefit from a flexible schedule." (Doc. 11-8, p. 51). Dr. Estock recommended casual contact with the public and casual and supportive feedback from supervisors. (Doc. 11-8, p. 52).

*Dr. David Wilson's Opinion*

At the request of Ms. Hunter's attorney, Dr. David Wilson evaluated Ms. Hunter at Gadsden Psychological Services on December 8, 2014.  (Doc. 11-14, p. 33).  Dr. Wilson indicated that, as a part of his evaluation, he reviewed "extensive records" that Ms. Hunter's attorney provided.  (Doc. 11-14, p. 33).  Those records included records from C.E.D. Mental Health Center dating between May 2013 and September 2014.  Dr. Wilson listed all of the records that he reviewed and described Ms. Hunter's previous psychological evaluations and diagnoses.  (Doc. 11-14, p. 33).  With respect to the C.E.D. records, Dr. Wilson stated that Ms. Hunter was "diagnosed with Panic Disorder w/o Agoraphobia and Major Depression Recurrent Severe with Psychotic Features."  (Doc. 11-14, p. 33).[5]

Dr. Wilson provided an overview of Ms. Hunter's familial, educational, social, and medical history.  (Doc. 11-14, pp. 33-35).  Dr. Wilson noted that during his evaluation of Ms. Hunter, "[s]he looked extremely anxious."  (Doc. 11-14, p. 33).  Ms. Hunter reported that she did not have friends except for one woman who

_____

[5] C.E.D. records appear in the administrative record.  All of them are relevant to Ms. Hunter's appeal.  The first is dated May 29, 2013.  (Doc. 11-8).  It is a record of Ms. Hunter's first visit.  Ms. Hunter reported experiencing panic attacks three to four times per week.  She reported poor sleep and racing thoughts.  She stated that she became confused easily and could not focus.  She could not recall her family medical history.  Ms. Hunter reported chronic pain, chest pain, and dizzy spells.  She was diagnosed with panic disorder with agoraphobia and major depression, recurrent, severe, with psychotic features and multiple physical health issues were noted in Axis III.  (Doc. 11-8, pp. 75-79).  There are additional records for July 19, 2014, July 21, 2014, July 25, 2014, September 19, 2014, (Doc. 11-8, pp. 145-161), October 31, 2014, and April 22, 2015, (Doc. 11-17; pp. 165-66).

drove her to doctor appointments.  (Doc. 11-14, p. 36).  Ms. Hunter reported that she attended Lakeview Holiness Church, but sometimes she did not go because she was sick all the time.  (Doc. 11-14, p. 36).

On the day of her evaluation, Ms. Hunter's treating physicians had prescribed the following medication:   Pravastatin (high cholesterol), Celebrex (arthritis), Trileptal bid (ADHD), Albuterol (asthma), Hydrochlorothiazide (hypertension), Toprol (angina), Zoloft (depression), and Klonopin (anxiety).  (Doc. 11-14, p. 34). She reported that Klonopin and Zoloft made her sleepy.  (Doc. 11-14, p. 34).  Ms. Hunter was receiving mental health treatment in Fort Payne every four to six weeks. (Doc. 11-14, p. 34).  Ms. Hunter reported that when she attended her counseling sessions or an appointment with a psychiatrist, the staff at the mental health center allowed her to sit outside until her appointment because she could not sit in the crowded waiting area.  (Doc. 11-14, p. 34).

Regarding Ms. Hunter's mental status, Dr. Wilson noted that Ms. Hunter's thought process was intact, and her speech was clear and normal.  (Doc. 11-14, pp. 35-36).  Dr. Wilson also noted that Ms. Hunter had no obvious phobias, obsessions, or compulsions, but he indicated that Ms. Hunter's affect was restricted.  (Doc. 11-14, p. 36).  Dr. Wilson wrote that "[Ms. Hunter] denied indicators of hallucinations, delusions or ideas of reference except thinking her grandmother has called her after she died."  (Doc. 11-14, p. 36).  Ms. Hunter reported that she was afraid to be home

alone, that she had difficulty eating and sleeping, that she used to have panic attacks once a week, that she was forgetful, and that she constantly felt that she was in "a dark place." (Doc. 11-14, p. 36).

Dr. Wilson stated that Ms. Hunter had very poor mental control and attention. (Doc. 11-14, p. 37). Dr. Wilson indicated that Ms. Hunter had "serious problems with short term and working memory." (Doc. 11-14, p. 37). She recalled one of three items after 10 minutes. (Doc. 14-11, p. 37). Her efforts to recall information made her anxious. (Doc. 11-14, p. 37). Using the Pain Patient Profile, a self-report inventory, Dr. Wilson found that Ms. Hunter had a valid profile that indicated severe depression and anxiety. (Doc. 11-14, p. 37). Dr. Wilson noted that Ms. Hunter's responses indicated that she felt hopeless, helpless, and worthless. (Doc. 11-14, p. 37).

Dr. Wilson diagnosed Ms. Hunter with major depressive disorder and recurrent severe panic disorder. (Doc. 11-14, p. 38). He also concluded that Ms. Hunter had low average intelligence, impaired memory, fibromyalgia, asthma, high blood pressure, and morbid obesity. (Doc. 11-14, p. 38). Dr. Wilson noted that Ms. Wilson had "inadequate access to necessary medical or psychiatric care" and assigned Ms. Hunter a GAF score of 45. (Doc. 11-14, p. 38). Dr. Wilson stated that Ms. Hunter would have difficulty working based solely on her physical problems. (Doc. 11-14, p. 37). Dr. Wilson noted that Ms. Hunter's "ability to withstand the

pressures of the day to day occupational functioning" was "highly impaired," and found that it was "unlikely" that her condition would improve over the following 12 months. (Doc. 11-14, p. 37).

Dr. Wilson prepared a Mental Health Source Statement regarding Ms. Hunter's ability to perform work-related activities. (Doc. 11-14, p. 39). Dr. Wilson indicated that Ms. Hunter could not maintain regular attendance or be punctual, that she could not sustain an ordinary routine without special supervision, that she could not accept instructions and respond appropriately to criticism from supervisors, and that she could not maintain socially appropriate behavior in the workplace. (Doc. 11-14, p. 39). Dr. Wilson opined that Ms. Hunter's limitations dated to July 19, 2008, her alleged onset date. (Doc. 11-14, p. 39). Ultimately, Dr. Wilson opined that Ms. Hunter was not able to work because of her psychological symptoms, stating that over a 30-day period, she would miss 30 days of work. (Doc. 11-14, p. 39).

*Medical Evidence Relating to Ms. Hunter's Obesity*

Ms. Hunter's medical records indicate that her weight increased significantly from 2005 to 2017. In 2005 Ms. Hunter weighed 220 pounds. (Doc. 11-8, p. 4).[6]

---

[6] Dr. John S. Muller performed a psychological evaluation of Ms. Hunter on January 1, 2005. (Doc. 11-8, p. 2). Dr. Muller's notes state, "Ms. Hunter [stood] five feet tall and weigh[ed] an obese two hundred twenty pounds." (Doc. 11-8, p. 4). Dr. Muller noted that Ms. Hunter "moved without significant difficulty and show[ed] no deficits in posture or gait." (Doc. 11-8, p. 4).

By July of 2011, Ms. Hunter weighed 324 pounds, (Doc. 11-8, p. 8), and in August of 2017 Ms. Hunter was 371 pounds, (Doc. 11-19, p. 48).  Ms. Hunter was 5'0" tall and had a BMI of 70.53, qualifying her as morbidly obese.[7]

On July 7, 2011, Ms. Hunter visited Dr. Thomas Page at Doctors Care Inc. (Doc. 11-8, p. 7).  Ms. Hunter complained that her feet, ankles, and legs had been swollen for a few days and that she was short of breath.  (Doc. 11-8, p. 7).  Ms. Hunter weighed 324 pounds; her BMI was 60.2.  (Doc. 11-8, p. 8).  Dr. Page noted that Ms. Hunter was in no acute distress, but she was morbidly obese.  (Doc. 11-8, p. 8).  Ms. Hunter visited Dr. Page again on July 21, 2011.  (Doc. 11-8, p. 12).  Ms. Hunter's weight had not changed significantly.  (Doc. 11-8, p. 10).

When Ms. Hunter saw Dr. Stephanie Morgan on July 25, 2011, Ms. Hunter tearfully complained of back, hip, and leg pain.  (Doc. 11-8, pp. 12-13).  Dr. Morgan attributed Ms. Hunter's back pain to obesity.  (Doc. 11-8, p. 13).  Ms. Hunter

---

[7] "The National Institutes of Health [] define morbid obesity as: [b]eing 100 pounds or more above your ideal body weight[,] [] having a Body Mass Index (BMI) of 40 or greater[,] [o]r having a BMI of 35 or greater and one or more co-morbid conditions[.] The disease of morbid obesity interferes with basic physical functions such as breathing or walking.  Long-term implications of the disease include shorter life expectancy, serious health consequences in the form of weight-related conditions such as type 2 diabetes and heart disease, and a lower quality of life with fewer economic and social opportunities."  https://www.universityhealth.org/wellness-tips-information/everyday-health/obesity-weight-management/about-morbid-obesity#:~:text=The%20National%20Institutes%20of%20Health,or%20more%20co%2Dmorbid%20condition (last visited March 17, 2022).

BMI is a "measure of body fat based on height and weight that applies to adult men and women."  https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last visited March 17, 2022).

indicated that she was interested in gastric banding. (Doc. 11-8, p. 12).[8] Dr. Morgan described Ms. Hunter as alert, tearful, and morbidly obese. (Doc. 11-8, p. 13). Dr. Morgan indicated that she would refer Ms. Hunter to Dr. Les Miles at St. Vincent's East to discuss gastric banding. (Doc. 11-8, p. 14).

Ms. Hunter had an appointment with Phillip Rogers, CRNP, at Quality of Life on February 28, 2012. (Doc. 11-8, p. 37). Ms. Hunter sought treatment for hypertension and panic attacks. (Doc. 11-8, p. 37). Ms. Hunter weighed 333.2 pounds. Nurse Rogers indicated that Ms. Hunter had a normal respiratory effort, and her heart had a regular rate and rhythm. (Doc. 11-8, p. 39). Nurse Rogers indicated also that Ms. Hunter had left foot and ankle pain and swelling and joint pain. (Doc. 11-8, p. 39). Ms. Hunter explained that her husband had lost his job in 2011, so she was not able to afford some of her medication. (Doc. 11-14, p. 37).

Ms. Hunter visited Quality of Life on December 7, 2012. (Doc. 11-17, p. 156). Ms. Hunter was examined by Romaine Mackey, CRNP. (Doc. 11-17, p. 160). Ms. Hunter complained of an injury from a fall at home. (Doc. 11-17, p. 156). Ms. Hunter reported that she had anxiety, hyperlipidemia, and hypertension. (Doc. 11-17, p. 156). Ms. Hunter weighed 343 pounds; her BMI was 66.98. (Doc. 11-17, p.

---

[8] "Gastric banding is a weight loss surgery that involves placing a silicone band around the upper part of the stomach to decrease stomach size and reduce food intake." https://www.medicalnewstoday.com/articles/298313#:~:text=Gastric%20banding%20is%20a%20type,and%20Drug%20Administration%20(FDA) (last visited March 16, 2022).

158).  Nurse Mackey indicated that Ms. Hunter had chronic obesity.  (Doc. 11-17, p. 159).  He counseled Ms. Hunter on limiting sugars and high fat foods in her diet. (Doc. 11-17, p. 159).  Nurse Mackey instructed Ms. Hunter to exercise and to lose weight.  (Doc. 11-17, p. 159).  Nurse Mackey noted that Ms. Hunter had "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection" and a normal gait.  (Doc. 11-17, p. 159).

Ms. Hunter visited Dr. Stephanie M. Morgan on June 6, 2013.  (Doc. 11-8, p. 92).  Ms. Hunter wanted to establish a relationship with a primary care physician. (Doc. 11-8, p. 92).  Ms. Hunter asked to have a disability parking privileges form completed, and she complained of general joint pain.  (Doc. 11-8, p. 92).  Ms. Hunter weighed 356 pounds; her BMI was 66.  (Doc. 11-8, p. 93).  Dr. Morgan indicated that Ms. Hunter had morbid obesity.  (Doc. 11-8, p. 94).  Dr. Morgan stated that she "DISCUSSED DIET MODIFICATION WITH [Ms. Hunter], GAVE HER HEALTHY DIETS INCLUDING 200 CAL DIABETIC DIET, GOUT DIET AND A COOKBOOK FOR DIABETIC FOODS."  (Doc. 11-8, p. 94)(Allcaps in record). Dr. Morgan noted that she encouraged Ms. Hunter to practice portion control and calorie restriction.  (Doc. 11-8, p. 94).  Dr. Morgan encouraged Ms. Hunter to see a cardiologist and a rheumatologist when she was able.  (Doc. 11-8, p. 94).

On March 17, 2014, Ms. Hunter visited the Primary Care Centre as a new patient.  (Doc. 11-8, p. 123).  Ms. Hunter weighed 361 pounds; her BMI was 70.53.

(Doc. 11-8, p. 124).  The examining nurse practitioner, Kristie Burt, stated that Ms. Hunter was "*morbidly obese*, well developed, alert, in no acute distress."  (Doc. 11-8, p. 124) (emphasis in medical record).  Nurse Burt noted that Ms. Hunter had unlabored breathing, but Ms. Hunter had swelling in her lower extremities.  (Doc. 11-8, pp. 125-26).

At the end of 2014, Ms. Hunter weighed 372 pounds when she visited Dr. Lewis at Rapid Care Family Medical Center.  (Doc. 11-18, p. 5).  Ms. Hunter's BMI was 72.64.  (Doc. 11-18, p. 6).

Ms. Hunter's weight fluctuated in 2015.  When she visited Cherokee Medical Center on May 17, 2015, Ms. Hunter weighed 320 pounds.  (Doc. 11-14, pp. 110-11).  She complained of pain all over.  (Doc. 11-14, p. 110).  Ms. Hunter reported that her pain was aggravated by bending and lifting.  (Doc. 11-14, p. 110).  On July 11, 2015, Ms. Hunter visited Rapid Care for a wellness physical.  (Doc. 11-18, p. 10).  Ms. Hunter had gained 36 pounds since her Cherokee Medical visit in May.  (Doc. 11-18, p. 11).  Ms. Hunter's BMI was 69.64.  (Doc. 11-18, p. 11).  Ms. Hunter asked for refills of her medication.  (Doc. 11-18, p. 10).  She reported that she had lost her medication when she moved.  (Doc. 11-18, p. 10).  When Ms. Hunter returned to Rapid Care on February 13, 2016, for a physical, she weighed 371 pounds.  (Doc. 11-18, pp. 15-16).  Her BMI was 72.57.  (Doc. 11-18, pp. 15-16).

Two months later, Ms. Hunter was treated in the emergency room at Cherokee Medical Center for gastroenteritis and morbid obesity.  (Doc. 11-14, pp. 102-105). She had lost 71 pounds; she weighed 300 pounds.  (Doc. 11-14, p. 104).  Ms. Hunter reported that she was experiencing abdominal pain, cramping, nausea, vomiting, and diarrhea.  (Doc. 11-14, p. 102).  She received prescriptions to treat nausea and diarrhea, and she was instructed to follow a clear liquid diet.  (Doc. 11-14, p. 105).

At Rapid Family Care on May 2, 2016, Ms. Hunter weighed 360 pounds. (Doc. 11-18, p. 26).  She complained of diarrhea and vomiting that had lasted for four weeks.  (Doc. 11-18, p. 25).  She explained that she had been told at the ER a month before that she had a stomach virus, but she reported that her symptoms persisted.  (Doc. 11-18, p. 25).

Ms. Hunter's weight was stable until July 29, 2017.  (Doc. 11-18, p. 31; Doc. 11-14, p. 89; Doc. 11-20, p. 15).  Ms. Hunter was admitted to the burn unit at WellStar Cobb Hospital in Austell, Georgia.  (Doc. 11-19, p. 3).  Ms. Hunter complained of a rash that covered her body that she believed was the result of an allergic reaction to a new medication.  (Doc. 11-19, p. 53; Doc. 11-20, p. 14).  She had been treated with steroids.  (Doc. 11-19, p. 53).  Ms. Hunter was admitted because she had a high white blood cell count and severe sepsis.  (Doc. 11-19, p. 3). On August 1, 2017, Ms. Hunter weighed 382 pounds.  (Doc. 11-19, p. 48).  Her BMI was 74.6.  (Doc. 11-19, p. 48).  On August 2, 2017, the Clinical Impression section

of Ms. Hunter's record states: "pt presents with significantly impaired mobility and gait and feels as though she is going to black out after walking only about 8 ft of gait w/seated rest break in between." (Doc. 11-19, p. 37). The notes indicate that Ms. Hunter could not manage the five steps into her home; she needed "skilled acute PT services." (Doc. 11-19, pp. 37-38). Ms. Hunter's "problem list" was "Impaired gait; Impaired balance; Impaired functional ability; Decreased activity tolerance." (Doc. 11-19, p. 38). The physician recommended rehab four to seven times per week and indicated that Ms. Hunter's rehab potential was good. (Doc. 11-19, p. 38). Ms. Hunter was released on August 3, 2017. (Doc. 11-19, pp. 3-5). At discharge, Ms. Hunter was instructed to follow a diabetic diet. (Doc. 11-19, pp. 3-5).

*Ms. Hunter's Administrative Hearing*

Ms. Hunter's administrative hearing was held on May 16, 2019. (Doc. 11-9, p. 46). Ms. Hunter testified that she dropped out of high school in the tenth grade. (11-9, p. 51). She testified that she worked for six months in 1992, but she had not worked since then. (Doc. 11-9, p. 51).

Ms. Hunter testified that she began having panic attacks in 2005, and she had three to four attacks per week. (Doc. 11-9, p. 53). When asked about the cause of her panic attacks, Ms. Hunter stated that she would get really scared and nervous when she went out in public without a family member. (Doc. 11-9, p. 54). Ms. Hunter testified that she believed that people were staring and laughing at her. Ms.

Hunter explained that when she had panic attacks, it felt like her head was spinning and her heart was racing.  (Doc. 11-9, p. 54).  Ms. Hunter indicated that she was diagnosed with agoraphobia because it was hard for her to leave home.  (Doc. 11-9, p. 55).  She testified that she stopped driving in 2012 because of panic attacks and her fear of wrecking.  (Doc. 11-9, p. 63).

Ms. Hunter spoke about her weight gain between 2005 and 2011.  (Doc. 11-9, p. 56).  Ms. Hunter confirmed that her weight "jumped up really fast."  (Doc. 11-9, p. 56).  Ms. Hunter confirmed also that she weighed about 200 pounds in 2005, and she weighed 324 pounds in July of 2011.  (Doc. 11-9, pp. 55-56).  During this time, Ms. Hunter propped up her legs in chairs for approximately six hours each day because her legs were swelling.  (Doc. 11-9, p. 56).  Ms. Hunter stated that because of the swelling in her legs and feet, her shoes would get so tight that her husband would have to remove them.  (Doc. 11-9, pp. 56-57).

Ms. Hunter used a cane and a walker.  (Doc. 11-9, pp. 58-59).  Ms. Hunter could not remember the exact dates she used them, but she explained that she began using the walker because she was falling.  (Doc. 11-9, pp. 58-59).  Ms. Hunter stated that she could walk for about five minutes before she had to sit down because she "would get very sore and start hurting and [her] legs would feel funny."  (Doc. 11-9, p. 58).  Ms. Hunter explained that she could stand for ten to fifteen minutes.  (Doc.

11-9, p. 58). Ms. Hunter testified that she could sit for twenty minutes before she needed to walk around. (Doc. 11-9, pp. 57-58).

Ms. Hunter testified that she had lingering side effects from a facial stroke that she experienced in 2000. (Doc. 11-9, p. 60). Ms. Hunter stated that she had difficulty raising her right hand and that she felt forgetful, confused, and foggy. (Doc. 11-9, p. 60). Ms. Hunter testified that she had fibromyalgia and carpal tunnel. (Doc. 11-9, p. 61). Ms. Hunter stated that she was unable to lift a gallon of milk from the floor and that she would frequently drop things. (Doc. 11-9, p. 61). Ms. Hunter explained that she had to use shirts without buttons because of the trouble she had with her hands. (Doc. 11-9, p. 61).

When asked about Dr. Wilson's observation that she had trouble being punctual and accepting criticism, Ms. Hunter agreed, stating that she believed that she would be unable to accept criticism from a supervisor because she was emotional when she received feedback. (Doc. 11-9, p. 64). Ms. Hunter confirmed that she had trouble staying on a schedule. (Doc. 11-9, p. 64). During a thirty-day period, Ms. Hunter estimated that she may not get dressed or bathe for ten to fifteen days. (Doc. 11-9, p. 62).

Ms. Hunter's attorney asked the vocational expert, Dr. Jewel Euto, about the level of absenteeism and "off task behavior" generally tolerated in the workplace for unskilled workers. (Doc. 11-9, p. 66). Dr. Euto testified that if an individual, on a

22

consistent basis, exceeded one day off per month or exceeded ten percent off task behavior, they would be precluded from all work. (Doc. 11-9, p. 65). Dr. Euto testified that individuals who were unable to maintain attention for two hours at a time or to interact with coworkers or supervisors would be unable to maintain employment. (Doc. 11-9, p. 66). Ms. Hunter's attorney incorporated into a hypothetical for an individual in an unskilled workplace the limitations that Ms. Hunter testified to for standing, sitting, and walking. Dr. Euto stated that those behaviors would not be tolerated. (Doc. 11-9, pp. 66-67). The ALJ did not pose hypotheticals to the VE.

## THE ALJ'S DECISION

The ALJ found that Ms. Hunter had not engaged in substantial gainful activity since December 31, 2011, the application date. (Doc. 11-9, pp. 15-16). The ALJ determined that Ms. Hunter was suffering from the severe impairment of hypertension, morbid obesity, panic disorder with agoraphobia, and depression. (Doc. 11-9, p. 16). The ALJ determined also that Ms. Hunter suffered from the non-severe impairments of migraine headaches, rhythm disorder, sleep apnea, erythrodermic psoriasis, gastroesophageal reflux disease, hypoglycemia, asthma, fibromyalgia, and carpal tunnel syndrome. (Doc. 11-9, pp. 16-17). Based on a review of the medical evidence, the ALJ concluded that Ms. Hunter did not have an impairment or combination of impairments that met or medically equaled the

severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix

1.  (Doc. 11-9, pp. 17-18).

Given Ms. Hunter's impairments, the ALJ determined that Ms. Hunter had

the RFC to perform:

> light work as defined in 20 CFR 416.967(b) except she can occasionally
> climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  She
> would need to avoid exposure to unprotected heights and hazardous,
> moving machinery.   She requires work with no more than the
> understanding, remembering, and carrying out of simple instructions.
> She can handle occasional decision-making and changes in the work
> setting.   She can sustain said mental work activities for two-hour
> periods and with normal breaks (mid-morning, lunch, mid-afternoon),
> can sustain said activities over an eight-hour workday.  Her interaction
> with coworkers, supervisors, and the public is limited to occasional.
> Because of mental impairments caused symptoms rendering the
> claimant unable to sustain task attention and performance, the claimant
> will be absent one day per month.

(Doc. 11-9, pp. 21-22).  "Light work involves lifting no more than 20 pounds at a

time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even

though the weight lifted may be very little, a job is in this category when it requires

a good deal of walking or standing, or when it involves sitting most of the time with

some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).  "If

someone can do light work, . . . he can also do sedentary work, unless there are

additional limiting factors such as loss of fine dexterity or inability to sit for long

periods of time."  20 C.F.R. § 404.1567(b).  "Sedentary work involves lifting no

more than 10 pounds at a time and occasionally lifting or carrying articles like docket

files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

Ms. Hunter had no relevant past work experience.  (Doc. 11-9, p. 29).  The ALJ opted not to rely on the VE testimony from the 2019 hearing.  Instead, the ALJ turned to interrogatory responses that the ALJ obtained in 2014 when Ms. Hunter was unable to attend an administrative hearing because of panic attacks, her inability to drive to a hearing, and her husband's work schedule that made it difficult for him to drive her to a hearing.  (Doc. 11-7, p. 64).  Based on the RFC and the 2014 VE responses, the ALJ found that jobs existed in significant numbers in the national economy that Ms. Hunter could have performed, including laundry worker, cleaner, and dishwasher.  (Doc. 11-9, p. 30).  Accordingly, the ALJ determined that Ms. Hunter was not disabled within the meaning of the Social Security Act from December 21, 2011, the date Ms. Hunter filed her application, until August 23, 2017. (Doc. 11-9, p. 30).

## STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close

scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel*, 631 F.3d at 1178 (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If a district court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

The ALJ's decision does not rest on substantial evidence.  There are several flaws in the opinion.  The Court identifies a few for purposes of illustration and remands this matter for further proceedings.

First, the ALJ gave great weight to the opinion of non-examining State agency psychiatrist, Robert Estock.  (Doc. 11-9, p. 27).  As the Court has noted, Dr. Estock reviewed Ms. Hunter's records in April of 2012.  The records available to Dr. Estock were very limited.  Logically, Dr. Estock did not review Ms. Hunter's mental health records from 2013 and 2014.  Dr. Estock did not review Dr. Wilson's opinion, which the Eleventh Circuit found relevant to the issue before the ALJ.  Dr. Estock's opinion from 2012 sheds little light on the period from December 2011 to August 2017; Dr. Estock rendered his opinion four months into that nearly five-year period.  The ALJ relied on Dr. Estock's opinion for the RFC that he assigned Ms. Hunter, and he relied on that RFC for the interrogatories that he sent to a VE in 2014.  The ALJ relied on the interrogatory responses in determining that there were jobs in the economy that Ms. Hunter could perform.  (Doc. 11-9, p. 30).

In addition, the ALJ gave little weight to Dr. Wilson's December 2014 psychiatric opinion because the "medical evidence prior to and concurrent with Dr. Wilson's opinion simply does not support the limitations he reported . . . ."  (Doc. 11-9, p. 28).  In his assessment of Dr. Wilson's opinion, the ALJ stated that the

medical evidence reflected only one exacerbation of Ms. Hunter's mental health problems. (Doc. 11-9, p. 28). The ALJ seems to have overlooked the May 29, 2013 C.E.D. record in which Ms. Hunter was diagnosed with panic disorder with agoraphobia and major depression, recurrent, severe, with psychotic features. (Doc. 11-8, pp. 75-79). Dr. Wilson relied on that opinion. (Doc. 11-14, p. 33).

The Court recognizes that an ALJ does not have to give deference to a consultative opinion. *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); *see also Denomme v. Comm'r of Soc. Sec.*, 518 Fed. Appx. 875, 877 (11th Cir. 2013) ("The ALJ does not have to defer to the opinion of a physician who conducted a single examination, and who was not a treating physician."). An ALJ can "reject the opinion of any physician if the evidence supports a contrary conclusion," *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985), but here, Ms. Hunter's mental health records suggest significant mental health issues and limitations. The Court does not express an opinion regarding the appropriate weight to accord Dr. Wilson's opinion. The Court instead finds that the ALJ did not provide sufficient reasoning to support his finding because the ALJ did not account for the medical records that Dr. Wilson reviewed, particularly Ms. Hunter's C.E.D. mental health records that were available to Dr. Wilson when he issued his report.

The Court notes that the ALJ was critical of some of Ms. Hunter's mental health records because some of Ms. Hunter's treating and consulting mental health

providers commented on Ms. Hunter's physical health conditions.  (Doc. 11-9, pp. 27-28).  Two points merit mention.  First, Ms. Hunter's mental health care providers commented on Ms. Hunter's physical health conditions because those conditions informed Ms. Hunter's mental health.  For example, her morbid obesity impacted her anxiety about social situations.  Second, the ALJ cited physical health conditions discussed in Ms. Hunter's mental health records when comments about physical health conditions supported his decision.  (Doc. 11-9, p. 26) (citing notation in September 2014 mental health record indicating that Ms. Hunter had no significant issues with mobility).   An ALJ cannot cherry-pick evidence in an applicant's medical records.  *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986*)* ("It is not enough to discover a piece of evidence which supports [a] decision, but to disregard other contrary evidence[,]" and a decision is not supported where it was reached "by focusing upon one aspect of the evidence and ignoring other parts of the record");  *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

      With respect to Ms. Hunter's mental health treatment records, the ALJ stated that Ms. Hunter did not seek mental health treatment for "almost a year and a half, until she presented to C.E.D. Mental Health Center on May 29, 2013, for an initial

assessment. However, there is no indication the claimant actually returned for any further treatment or therapy and attempts to update the evidence have yielded no further treatment at C.E.D. Mental Health Center." (Doc. 11-9, p. 20). Again, two points merit mention. First, in his 2014 report, Dr. Bentley pointed out that Ms. Hunter had not received formal psychiatric treatment because she did not have health insurance. (Doc. 11-8, p. 41). Second, the ALJ seems to have overlooked Ms. Hunter's records from C.E.D. dated July 19, 2014, July 21, 2014, July 25, 2014, September 19, 2014, (Doc. 11-8, pp. 145-161), October 31, 2014, and April 22, 2015, (Doc. 11-17; pp. 165-66).[9]

To the extent that the ALJ based his opinion on gaps in Ms. Hunter's treatment, the Court notes that, as the ALJ recognized, (Doc. 9-11, p. 25), the administrative evidence indicates that Ms. Hunter often did not have the means to pay for treatment. (*See*, *e.g.*, Doc. 11-14, pp. 37-38). For example, Dr. Morgan encouraged Ms. Hunter to see a cardiologist and a rheumatologist, but Ms. Hunter reported that she was "unable to do so at this time." (Doc. 11-8, p. 94). In addition, Ms. Hunter's treatment records suggest that she sometimes was not able to attend medical appointments because she did not have transportation. (Doc. 11-17, p. 165). When a claimant cannot afford prescribed treatment, she is excused from

---

[9] Ms. Hunter's October 2014 C.E.D. record indicates that she had made no progress toward mitigating her anxiety; she was experiencing anxiety daily. (Doc. 11-17, p. 165). Ms. Hunter reported nightmares and poor sleep, confusion, and "lots of social anxiety." (Doc. 11-17, p. 165).

noncompliance.  *See Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988).  The burden of proving unjustified noncompliance is on the Commissioner.  *See Dawkins*, 848 F.2d at 1213.

Finally, because of Ms. Hunter's diagnosed anxiety disorder, her ability to "function adequately as a housewife" and her ability to go out "in public with family" is not predictive of her ability to function in a work environment.  (Doc. 11-9, p. 25).  Ms. Hunter consistently reported that she could not go out in public without her husband or her son.  (*See* Doc. 11-8, p. 41).  The question is whether Ms. Hunter could function in public unaccompanied by a family member such that she could work outside her home.  Ms. Hunter's reluctance to attend an administrative hearing is relevant to this observation.  So is Ms. Hunter's report to Dr. Wilson that the staff at C.E.D. allowed her to sit outside to wait for her mental health appointments because she could not sit in a waiting area with other patients. (Doc. 11-14, p. 34).

## CONCLUSION

For the reasons discussed above, the Court remands this matter to the Commissioner for further proceedings consistent with this opinion.

**DONE** and **ORDERED** this March 31, 2022.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT